OPINION OF THE COURT BY
JUSTICE KELLER
Baptist Health Richmond, Inc. petitioned the Court of Appeals for a writ prohibiting the Madison Circuit Court from enforcing its order requiring Baptist Health to produce certain documents that had been requested in discovery by the real party in interest. The Court of Appeals denied the petition, and Baptist Health appeals from that denial. The issue on appeal is whether the requested documents are protected from disclosure by the Patient Safety and Quality Improvement Act of 2005 (the Act), 42 U.S.C.A. § 299b-21 et. seq. Having reviewed the record and the arguments of the parties, we vacate the trial court’s discovery order and remand for further proceedings consistent with this opinion.
I. BACKGROUND.
Eva Louise Nall (Agee) underwent la-proscopic surgery and subsequently died. Her husband, Tim Agee, individually and on behalf of her estate, sued Baptist Health and a number of medical care providers alleging that her death was the result of medical negligence. During discovery, Mr. Agee propounded a request for production of documents to Baptist Health. The request at issue sought: “any and all incident reports, investigation reports, sentinel event reports, root cause analysis reports, Joint Commission reports, Medicare reports, Medicaid reports, peer review reports and reports of any nature relating to Eva Louise Nall (Agee).” Baptist. Health designated which documents it believed fell within the request but refused to produce them claiming that they were protected from disclosure by the Act. Mr. Agee filed a motion to compel, which the trial court granted in part, holding that only those documents that had been “collected, maintained, or developed for the sole purpose of disclosure to a Patient Safety Organization pursuant to the [Act]” are protected. As set forth above, Baptist Health then filed an original action in the Court of Appeals seeking a writ of prohibition. The Court of Appeals denied Baptist’s request, holding that the “sole purpose” standard applied by the trial court is consistent with this Court’s opinion in Tibbs v. Bunnell, 448 S.W.3d 796 (Ky.2014).
II. ANALYSIS
We begin our analysis with a review of Tibbs, a plurality opinion.[1] Although a majority of the Court agreed with the outcome in Tibbs, less than a majority agreed on the reasoning; therefore, Tibbs has no stare decisis effect. See Ware v. Commonwealth, Ky., 47 S.W.3d 333, 335 (2001). *762 However, Tibbs is certainly persuasive, and we find much with which we can agree in both the plurality and the dissenting opinions.
The trial court in Tibbs ordered the hospital to produce an “incident” or “event” report that had been generated by a hospital surgical nurse after the death of a patient. 448 S.W.3d at 798. Several physicians sought to prevent disclosure of that report, arguing that it was protected by the Act. Id. The trial court ordered the hospital to produce the report, and the physicians sought protection from the Court of Appeals via a writ of prohibition. Id. The Court of Appeals issued the requested writ, but found that the Act’s protection only extended to “documents that contain a self-examining analysis.” Id. at 799. In doing so, the Court of Appeals relied, in large part, on Francis v. United States, No. 09 Civ. 4004 (GBD)(KNF), 2011 WL 2224509 (S.D.N.Y. May 31, 2011) which indicated that the scope of the Act’s privilege extended only to the analysis and corrective actions related to an adverse event of medical error, Tibbs, 448 S.W.3d at 802. Thus, the Court of Appeals remanded the matter to the trial court for an in- camera review to determine if the requested document contained that type of self-examining analysis. Id.
In analyzing the Court of Appeals’s opinion, the plurality opinion in Tibbs pointed out that Congress enacted the Act:
In order to encourage health care providers to voluntarily associate and communicate privileged patient safety work product .., among themselves through in-house patient safety evaluation systems ... and with and through affiliated patient safety organizations ... in order to hopefully create an enduring national system capable of studying, analyzing, disseminating, and acting on events, solutions, and recommendations for the betterment of national patient safety, healthcare quality, and healthcare outcomes.
Tibbs, 448 S.W.3d at 800. To incentivize participation, the Act provides protection from disclosure to “certain categories of documents and communications termed ‘patient safety work product’ that are developed in connection with newly created patient safety organizations. This patient safety work product is considered privileged and, therefore, cannot be subject to disclosure.” Id. at 801 (quoting H.R. Rep. No. 109-197, 9 (2005)).
The plurality opinion then noted that the Court of Appeals’s reliance on Francis was misplaced because the language cited by the Court was dicta. Id. at 802. Furthermore, the plurality opinion noted that “the Court of Appeals relied on commentary from Francis regarding a prior version of the Act that never became law, rather than on the Act itself.” Id. Therefore, the plurality opinion determined that the Court of Appeals erred by limiting the scope of review by the trial court to “documents employing a self-critical analysis,” Id. at 802.
The plurality opinion then undertook its own analysis of the Act and set forth what it believed to be the proper scope of the Act’s privilege and the resultant scope of the trial court’s review. As cited by the plurality opinion, the Act defines patient safety work product as:
any data, reports, records, memoranda, and analyses (such as root cause analy-ses), or written or oral statements—
(i) which—
(I) are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or
(II)are developed by a patient safety organization for the conduct of patient safety activities;
*763 and which could result in improved patient safety, health care quality, or healthcare outcomes; or
(ii) which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system.
Tibbs, 448 S.W.3d at 803 (quoting 42 U.S.C.A. § 299b-21 (7)(A)). However, as the plurality opinion noted, Section (B) of 42 U.S.C.A. § 299b-21 (7) excepts certain material from being considered patient safety work product. Id.
(i) Information described in subpara-graph (A) does not include a patient’s medical record, billing and discharge information, or any other original patient or provider record.
(ii) Information described in subpara-graph (A) does not include information that is collected, maintained, or devel-opéd separately, or exists separately, from a patient safety evaluation system. Such separate information or a copy thereof reported to a patient safety organization shall not by reason of its reporting be considered patient safety work product.
(Hi) Nothing in this part shall be construed to limit—
(I) the discovery of or admissibility of information described in this subpara-graph in a criminal, civil, or administrative proceeding;
(II) the reporting of information described in this subparagraph to a Federal, State, or local governmental agency for public health surveillance, investigation, or other public health purposes or health oversight, purposes; or
(III) a provider’s recordkeeping obligation with respect to. information described in this subparagraph under Federal, State, or local law.
Id. Thus, the plurality opinion determined that the Act does not “protect information ‘collected, maintained or developed separately, or existing separately from a patient safety evaluation system’ even if collected by a Patient Safety Evaluation System and reported to a Patient Safety Organization.” Tibbs, 448 S.W.3d at 803-04. As the plurality opinion noted,
[T]he [Act] did not intend to supplant, or invalidate, traditional state monitoring dr regulation of health providers. See 42 U.S.C.A. § 299b-21 (7)(B)(i)-(iii).... [T]he United States Department of Health and Human Services’ own final rules negate any such intent: “The Patient Safety Act establishes a protected space or system that is separate, distinct, and resides alongside but does not replace other information collection activities mandated by laws, regulations, and accrediting and licensing' requirements as well as voluntary reporting activities that occur for th¿ purpose of maintaining accountability in the health care system.”
Id. at 807 (iquoting Patient Safety and Quality Improvement, 73 FR 70732-01 at 70742) (emphasis added in .opinion). Thus, the Act recognizes that providers who participate in the Act may be subject to “dual reporting obligations.” Id.
The plurality opinion noted that Kentucky mandates that:
Administrative reports shall be .established, maintained and utilized as necessary to guide the operation .. of [health care facilities.] 902 KAR 20:016 § 3(3)(a) (emphasis added). Such reports shall include, among others, , “incident investigation reports ... and ... [o]ther pertinent reports made in the regular course of business.” Id. And such facilities shall “have written policies and procedures governing all aspects of the operation of the facility and the services provided, including: ... (g) [a]n effective procedure for recording accidents in *764 volving a patient ..., including incidents of transfusion reactions, drug reactions, medication errors, and similar events ....” 902. KAR 20:016 § 3(4).
Id. at 808.
Based on the preceding, the plurality opinion determined that the information in the incident report in question “would be found in an incident report which is required by Kentucky regulations to be ‘established, maintained and utilized as necessary to guide the operation ... of the facility.’ 902 KAR 20:016 § 3(3)(a).” Id. at 809. The plurality opinion noted that the physicians claimed the privilege applied because the information was not kept separately but “was filed and stored in a database ostensibly dedicated to the Hospital’s Patient Safety Evaluation System' operated by its Risk Management Department and to which the hospital’s [patient safety organization] has access.” Tibbs, 448 S.W.3d at 809. However, the plurality opinion concluded that, while the information might “be relevant to [the hospital’s] endeavors under the Act, it is not, nor can it be, patient safety work product, since its collection, creation, maintenance, and utilization is mandated by the Commonwealth of Kentucky as part of its regulatory oversight of its healthcare facilities.” Id. Thus, the plurality opinion concluded that the trial court should, on remand, separate the information “normally contained in ... state-mandated incident reports” from “material properly privileged under the Act,” and permit discovery of the non-privileged information. Id.
The dissent agreed with much of what the plurality opinion said about the Act and that “patients or their estates are entitled to” information contained in state mandated reports. Id. at 810. As the dissent noted, the Act does not displace state law because:
[WJhen laws or regulations require the reporting of the information regarding the type of events also reported to [patient safety organizations], the Patient Safety Act does not shield providers from their obligation to comply with such requirements. These external obligations must be met with information that is not patient safety work product and oversight entities continue to have access to this original information in the same manner as such entities have had access prior to the passage of the Par tient Safety Act.
Id. at 814 (quoting Patient Safety and Quality Improvement, 73 FR 70732-01 at 70742)(emphasis added in opinion).
However, the dissent also noted that: [The Senate Committee found] that broad protections are essential to encourage reporting. Currently, there are few incentives and many barriers for providers to collect and report information regarding patient safety. The primary barrier relates to concerns that information shared to promote patient safety would expose providers to liability. Unless this information can be freely shared, errors will continue to be hidden and errors will be repeated. A more open, nonpunitive learning environment is needed to encourage health care professionals and organizations to identify, analyze, and report errors without facing the threat of litigation and, at the same time, without compromising plaintiffs’ legal rights or affecting existing and future public reporting initiatives with respect to the underlying data.
Tibbs, at 813-14.
According to the dissent, permitting judges “to sift through federally protected patient safety data for otherwise discoverable material under state law ... [would] frustrate the Act’s intent.” Id. 810. Thus, the dissent concluded that material, once included in the patient safety evaluation system or submitted to a patient safety *765 organization, is protected until removed from that system or organization. Therefore, the only questions for a trial court to answer in a discovery dispute would be: was the requested information eve r included in the patient evaluation system and, if it was included, was it removed. If the answer to the first question is, “Yes,” and the answer to the second question is, “No,” then the information would be protected from discovery.
While this matter has been pending, the Department of Health and Human Services (HHS) issued additional guidance regarding interpretation and implementation of the Act. In pertinent part, HHS stated that “the Patient Safety Act does not permit providers to use the privilege and confidentiality protections for [patient safety work product] to shield records required by external recordkeeping or. reporting requirements.” Patient Safety and Quality Improvement Act of 2005—HHS Guidance Regarding Patient Safety Work Product and Providers’ External Obligations, 81 FR 32655-01 at 32657. HHS went on to note that providers have been misusing the Act in two ways to shield from discovery otherwise discoverable documents.
First, some providers with, recordkeep-ing or record maintenance requirements appear to be maintaining the required records only in their [patient safety evaluation system] and then refusing to disclose the records, asserting that the records in their [patient safety evaluation system] fulfill the applicable regulatory requirements while at the same time maintaining that.the records are privileged and confidential [patient safety work product]. Second, some providers appear to develop records to meet external obligations outside of the [patient safety evaluation system], place a duplicate copy of the required record into the [patient safety evaluation system], then destroy the original outside of the [patient safety evaluation system] and refuse to disclose the remaining copy of the information, asserting that the copy is confidential and privileged [patient safety work product]. The Patient Safety Act was not intended to give providers such methods to evade their regulatory obligations.
Id. at 32657-58. Therefore,
HHS interprets “original provider records” to include: (1) Original records (e.g., reports or documents) that are required of a provider to meet any Federal, state, or local public health or health oversight requirement regardless of whether such records are maintained inside or outside of the provider’s patient safety evaluation system; and (2) . copies of records residing within the provider’s [patient safety evaluation system] that were prepared to satisfy a Federal, state, or local public health or health oversight record maintenance requirement, if while the provider is obligated to maintain such information, the information is only maintained by the provider within the [patient safety evaluation system] (e.g., if the records or documents that were being maintained outside the [patient safety evaluation system] to fulfill the external obligation were lost or destroyed).
Id. at 32658 (footnote omitted). Thus, reports that are required by the Commonwealth do not become privileged because the provider puts them in its patient safety evaluation system.
The dissent noted that there might be times when a hospital would not “generate a state-mandated record or report” thus frustrating a civil plaintiffs legitimate request for information. Tibbs, 448 at 815-16. The dissent’s solution to this dilemma is for “an interested party to demand that a required record or report be generated.” *766 Id. at 816. However, as HHS states, the solution is “for providers ... to satisfy their external obligations outside of a [patient safety evaluation system].” 81 FR 32655-01 at 32658. Providers who satisfy those obligations should then have no fear that trial courts will be meddling in federally protected documentation.
Having reviewed Tibbs, the arguments of the parties, the amicus curiae herein, and the new HHS guidance, we believe that the correct result in this case lies in middle ground between the plurality and the dissenting opinions in Tibbs. We agree with the dissent that mandating invasion of “the hospital’s patient safety evaluation system” by trial courts every time there is a discovery dispute would “discourage participation in the patient safety system by Kentucky’s healthcare providers.” Id. at 816. However, permitting hospitals to place and leave otherwise discoverable information in the patient safety evaluation system in order to shield it from discovery is equally unacceptable and, as noted by HHS, is not in keeping with the Act. Furthermore, the dissent in Tibbs did not state how an interested party would make a demand that a provider generate a report; to whom that demand would be made; or what mechanism exists to enforce any order granting such a demand. Thus, we believe that the solution offered by the dissent in Tibbs is not viable.
In summary, a provider who participates in the Act may collect information within its patient safety evaluation system that complies with the Act and that also complies with state statutory and regulatory requirements. However, doing so does not relieve the provider from complying with those state requirements and, to the extent information collected in the provider’s internal patient safety evaluation system is needed to comply with those state requirements, it is not privileged.
The existence of the Act does not relievé providers from fulfilling their statutory and regulatory reporting obligations. As long as a provider fulfills those obligations, the trial court has no reason to review the ■ information in the provider’s patient safety evaluation system. However, if a provider fails to fulfill those obligations, the court can conduct an in camera review of the documents in the provider’s patient safety evaluation system. In conducting that review, the court should separate the information that is usually contained in state-mandated reports from information that is not usually contained in those reports. The information that is usually contained in state-mandated reports is not protected by the patient' safety work product privilege provided in the Act and will be discoverable. Because the provider is claiming the privilege, it bears the burden of proving that it complied with the statutory and regulatory reporting requirements. If the provider fails to meet that burden, the party seeking the information then bears the burden of establishing what information is generally contained in state-mandated reports.
III. CONCLUSION.
For the foregoing reasons, we vacate the trial coúrt’s order requiring Baptist Health Richmond, Inc. to produce documents, and we remand with instructions for the court to undertake the review as set forth herein.
All sitting. Keller, Cunningham, Noble and Venters, JJ., concur. Hughes, J., concurs by separate opinion in which Minton, C.J. and Wright, J., join.

. Justice Scott wrote the plurality opinion, in which Justices Venters and, Cunningham fully concurred. Justice Noble concurred in result only without separate opinion and Justice Hughes wrote a dissenting opinion which Chief Justice Minton joined. Justice Keller did not sit because she had presided over the Court of Appeals panel that granted the requested writ.