[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-13107

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 12 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00080-CV-WDO-5

RUSSELL E. ADKINS, MD,

Plaintiff-Appellant,

versus

ARTHUR P. CHRISTIE, Individually,
and in his Official Capacity as
the Administrator of Houston Medical
Center,
ANTHONY L. ALFORD, Individually and
in his Official Capacity as Executive
Director for Medical Affairs of Houston
Medical Center,
DANIEL A. DEIGHTON, Individually and
in his Official Capacity as Chief of
Staff and in his Official Capacity as a
Member of the Medical Executive Committee
at Houston Medical Center,
FREDERICK W. JENNART, Individually and
in his Official Capacity as a Member of
the Medical Executive Committe at Houston
Medical Center,
DAVID N. HARVEY, MD, Individually, and in his
Official Capacity as a Member of the Medical
Executive Committee at Houston Medical
Center, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

**(June 12, 2007)**

Before EDMONDSON, Chief Judge, BIRCH  and WILSON, Circuit Judges.

WILSON, Circuit Judge:

This appeal concerns an evidentiary privilege known as the "medical peer review privilege."  The privilege seeks to protect from discovery and disclosure records containing performance reviews and assessments of physicians by their peers, primarily in connection with their practices at hospitals.  The issue before us is whether to recognize the privilege in federal civil rights cases.  The Fourth and Seventh Circuits have denied the privilege in these cases.  We join them in declining to recognize a privilege for documents relating to medical peer review proceedings in federal discrimination cases.

We also conclude in this opinion that the district court improperly limited the scope of discovery and, as a result, prematurely granted Defendants' motion for summary judgment.

2

*Background*

These issues arose in Dr. Russell Adkins' federal civil rights action, filed pursuant to 42 U.S.C. §§ 1983, 1981 and 1985. In his complaint, Adkins, an African-American staff physician with privileges at the Houston Medical Center ("HMC"), asserted that HMC and several HMC physicians (collectively "Defendants") discriminated against him on racial grounds in their implementation and utilization of HMC's peer review and physician disciplinary process. In conformity with Medical Staff Bylaws, Adkins was provisionally admitted to practice at HMC in 1997 for a minimum of one year. Adkins contends that during this first year, the head of the Department of Surgery, Dr. Deighton, unilaterally chose to review all of Adkins' medical charts, an unusually high level of review for new physicians. None of Adkins' cases during his first year were found to warrant further investigation by a peer review committee. Nevertheless, HMC extended his provisional status by six months on the grounds that he allegedly failed to follow protocols for pre-admission of surgical patients, failed to complete medical records in a timely manner and had problems with availability for call. Adkins concedes that he failed to complete medical charts within the time frame dictated by HMC's Medical By-laws on eight different occasions during that time. However, he argues that such delays were a hospital-wide problem and that

3

Deighton himself acknowledged having received warning letters for failure to complete his charts in a timely manner.

Adkins further claims that in 2001, and again in 2002, HMC imposed additional conditions on his continued employment even though he had a good record as a physician. Finally, Adkins claims that HMC deliberately mishandled the care of one of his patients, S.K., and later used that case as a pretext to take action against him. Specifically, he alleges that nurses falsified reports related to S.K.'s condition, refused to contact him about her care, and contravened his orders relating to her care, resulting in her pain and discomfort. He claims that the staff at HMC incorrectly informed S.K. that he was out of town, and deliberately withheld information about her status from him, which ensured that he was unavailable to assist her. He argues that HMC then used S.K.'s case as grounds to begin peer review of his practices, and unfairly determined that he was unavailable to assist S.K., meting out the disproportionately harsh penalties of suspension and subsequently, termination against him.

Defendants dispute this characterization of Adkins' practice at the hospital. They allege that Adkins repeatedly experienced problems with availability for call, timely completion of medical records and failure to follow hospital protocol on patient admissions. Defendants further allege that in 2002, Adkins grossly

4

mishandled a surgical operation on a seven-month-old infant by operating on him without proper surgical equipment, thus raising additional questions about his professional judgment. Finally, Defendants allege that peer review of Adkins' treatment of S.K. was automatically required by hospital procedure that mandated review of all patient cases involving repeat surgeries. They claim that external peer review determined that Adkins' availability and level of care was inadequate, and that in light of his record, suspension was an appropriate measure to protect the health and safety of patients at the hospital.

In May 2004, Defendants sought dismissal of Adkins' complaint for failure to state a claim on qualified immunity grounds. The district court converted this motion into one for summary judgment and initially allowed discovery on issues relating to qualified immunity only. During discovery, Adkins requested documents relating to peer review of *all* physicians at the hospital during the seven years that Adkins was a member of the hospital staff. In response, Defendants filed a motion for a protective order, arguing that Adkins was seeking information relating to the peer review process, which was covered by the Georgia medical peer review privilege.[1] Although the court concluded that the privilege applied to

---

[1] Georgia requires that "[t]he proceedings and records of medical review committees shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee." O.C.G.A. § 31-7-143. The Georgia Supreme Court

5

federal civil rights actions, it nevertheless ordered Defendants to provide Adkins with descriptions of all incidents giving rise to peer review, without disclosing the documents themselves. The court limited production to peer review documents covering physicians it deemed similarly situated to Adkins, namely physicians in the Department of Surgery during a five-year time period, rather than documents relating to all physicians with staff privileges at HMC during the seven-year time period requested by Adkins.

In response to Defendants' motion for summary judgment, the district court undertook in-camera review of the disclosed peer review files. The court also reviewed a list identifying the race of the forty-seven physicians at HMC that were suspended in the last five years. Following this review, the court granted summary judgment in favor of Defendants. Adkins now appeals the judgment, contending that the court improperly recognized the privilege, and improperly limited the scope of his discovery request.

*The Medical Peer Review Privilege*

Adkins argues that the district court incorrectly ruled that federal law allows for a medical peer review privilege in discrimination cases. The decision to

_____

has interpreted this statutory mandate as placing "an absolute embargo upon the discovery and use of all proceedings, records, findings, and recommendations of peer review groups and medical review committees in civil litigation." *Emory Clinic v. Houston*, 258 Ga. 434, 369 S. E. 2d 913, 913 (1988) (per curiam).

6

recognize a privilege is a mixed question of law and fact, which we review *de novo.* Fed. R. Evid. 501; *Carman v. McDonnell Douglas Corp.,* 114 F.3d 790, 793 n.2 (8th Cir.1997). While all fifty states and the District of Columbia recognize such a privilege, the Eleventh Circuit has not yet definitively ruled on whether it applies in federal court, and as we previously stated, the Fourth and Seventh Circuits have failed to recognize the privilege. *See Viramani v. Novant Health, Inc.*, 259 F.3d 284, 289 (4th Cir. 2001); *Mem'l Hosp. v. Shadur,* 664 F.2d 1058, 1063 (7th Cir. 1981) (per curiam).

Evidentiary privileges in the federal courts are governed by Fed. R. Evid. 501, which provides:

> Except as otherwise required by the Constitution . . . as provided by Act of Congress, or in rules prescribed by the Supreme Court . . . , the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed. R. Evid. 501.

The Federal Rules of Evidence empower the federal courts to "continue the evolutionary development of [evidentiary] privileges." *Trammel v. United States*, 445 U.S. 40, 47, 100 S. Ct. 906, 910, 63 L. Ed. 2d 186 (1980). However, these privileges remain disfavored and should not be lightly created. *United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 3108, 41 L. Ed. 2d 1039 (1974). The

7

Supreme Court has cautioned that privileges "contravene the fundamental principle that the public . . . has a right to every man's evidence." *Univ. of Pa. v. EEOC,* 493 U.S. 182, 189, 110 S. Ct. 577, 582, 107 L. Ed. 2d 571 (1990) (alteration in original) (internal quotation marks omitted). Accordingly, there is a presumption against privileges which may only be overcome when it would achieve a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel,* 445 U.S. at 50, 100 S. Ct. at 912. This is a high standard, and "only the most compelling candidates will overcome the law's weighty dependence on the availability of relevant evidence." *Pearson v. Miller,* 211 F.3d 57, 67 (3d Cir. 2000).

The Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996), provides us with useful guidance on how to determine whether an evidentiary privilege should be created. In *Jaffee*, the Supreme Court identified some factors as relevant to the inquiry including: 1) the needs of the public good; 2) whether the privilege is rooted in the imperative need for confidence and trust; 3) the evidentiary benefit of the denial of the privilege; and 4) consensus among the states. 518 U.S. at 10-16, 116 S. Ct. at 1928-31. In deciding whether to recognize a privilege, we must consider that there is "a general duty to give what testimony one is capable of giving, and that any exemptions

which may exist are distinctly exceptional, being so many derogations from a positive general rule." *Id*. at 9, 116 S. Ct. at 1928.

Defendants, joined by amicus curiae the Georgia Hospital Association, primarily rely on the needs of the "public good" to support their argument for recognizing a medical peer review privilege. They contend that the absence of the privilege would chill supervising physicians, making them less candid in their performance evaluations of staff physicians for fear that their assessments and statements might be used for improper purposes. For example, they contend that peer review materials might be used to generate medical malpractice litigation. They raise concerns about patient confidentiality. They argue that the quality of the oversight process, and thus of healthcare itself, would suffer if the privilege is not recognized.

We agree with HMC that the privilege it seeks would serve important interests. The privilege would promote vigorous oversight of physician performance. But the privilege must be considered against a corresponding and overriding goal – the discovery of evidence essential to determining whether there has been discrimination in employment. Guided by the principles disfavoring privileges, as well as the *Jaffee* factors, we conclude that the medical peer review process does not warrant the extraordinary protection of an evidentiary privilege in

9

federal civil rights cases. Here, we are confronted with a claim of racial discrimination within the peer review process itself, implicating the important social goal of eliminating employment discrimination. *See, e.g., Univ. of Pa.,* 493 U.S. at 193, 110 S. Ct. at 584 (finding that exposing "invidious discrimination is a great, if not compelling governmental interest").

Further, the documents that HMC seeks to protect are critical to Adkins' discrimination claims. The only way that Adkins can demonstrate the existence of disparate treatment in his case against the hospital is to compare his peer review with the peer review files of other physicians at HMC. In *Shadur,* the Seventh Circuit was similarly confronted with a situation where recognizing a medical peer review privilege would effectively bar a plaintiff's claim. *Shadur*, 664 F.2d at 1062-63. In that federal antitrust action, Plaintiff sought medical peer review materials in order to demonstrate that the Defendant physicians used the review process discriminatorily in furtherance of a conspiracy to destroy his practice and thus limit competition. *Id* at 1063. Taking into account the compelling public policy favoring such antitrust actions, the court found that the privilege should not be recognized when it would prevent the plaintiff from asserting his claim altogether. *Id.* In *Viramani*, the Fourth Circuit was similarly guided by the evidentiary benefit presented by peer review documents in employment

10

discrimination cases. 259 F.3d at 289. Confronted with a claim virtually identical to the one at hand, the court found that "[t]he interest in facilitating the eradication of discrimination by providing perhaps the only evidence that can establish its occurrence outweighs the interest in promoting candor in the medical peer review process." *Id.*

We recognize that health care providers, like HMC and its supervising physicians, have a legitimate interest in keeping peer review documents confidential and in protecting them from widespread dissemination. However, "[t]here is an important distinction between privilege and protection of documents, [with] the former operating to shield the documents from production in the first instance, [and] the latter operating to preserve confidentiality when produced." *Id.* at 288 n.4. In the absence of the privilege, the district court retains its authority to protect HMC's interests through other established means such as protective orders, confidentiality agreements, and when appropriate, by disclosure only after an in-camera review of these documents. *See*, *e.g., Kerr v. United States District Court,* 426 U.S. 394, 405, 96 S. Ct. 2119, 2125, 45 L. Ed. 2d 725 (1976) (noting that methods such as in-camera review of documents can be used to balance a party's need for confidentiality against an adverse party's need for evidence); *Marrese v. American Acad. of Orthopaedic Surgeons*, 726 F.2d 1150, 1160 (7th Cir. 1984) (*en*

11

*banc*) (noting that there are different ways for district courts to protect non-privileged documents) *rev'd on other grounds,* 470 U.S. 373, 105 S. Ct. 1327, 84 L. Ed. 2d 274 (1984). The district courts are well-equipped with a variety of mechanisms to ensure that peer review materials, once furnished through discovery, are not compromised by wayward hands, i.e., redaction of extraneous or confidential information, in-camera review and protective orders. The "public good" concerns advanced by the defendants may capably be served in the absence of a medical peer review privilege.

We are mindful of the fact that a medical peer review privilege is recognized by all fifty states and the District of Columbia, a factor that *Jaffee* lists in Defendants' favor. The Fourth Circuit addressed this argument in *Viramani*, and rejected that factor on the grounds that there is a strong evidentiary benefit to be obtained in a discrimination case, and that the state statutes address different policy concerns when they balance the need for candor in peer review discussions against a plaintiff's access to evidence in a malpractice suit. 259 F.3d at 290-91. The interests at issue in a discrimination claim like this one are different from that of a malpractice case, and merit a different analysis. As the *Viramani* court correctly observed, "[t]here is no evidence that state legislatures considered the potential impact on discrimination cases of a privilege for medical peer review

12

proceedings." *Id.* at 291. We agree that "the states' policy decisions, reflecting different concerns than those implicated here, [should] not inform the judgment of the court in this case." *Id.* Declining to recognize a medical peer review privilege in federal discrimination cases provides a strong evidentiary benefit. Balancing the interests to be derived from recognizing the privilege against the interest of furthering the discovery of probative and relevant evidence to root out invidious discrimination, we decline to recognize the privilege.

*Scope of Discovery*

Although the district court announced its recognition of the privilege, it still ordered some limited discovery. Adkins sought to compel production of peer review materials of *all* physicians at HMC during the seven-year period that he was employed there. The district court limited Adkins' inquiries to those involving physicians in the Department of Surgery and to the five-year period preceding his suspension.

We generally review the district court's efforts to manage discovery for abuse of discretion. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999). However, if we find that in limiting discovery, the district court "made a clear error of judgment . . . or . . . applied an incorrect legal standard," we must reverse that decision. *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1159

13

(11th Cir. 2004) (citing *Alexander v. Fulton County,* 207 F.3d 1303, 1326 (11th Cir. 2000)). Here, we find that the district court made such an error in concluding that review of physicians outside Adkins' department and beyond the five-year time limit was not relevant to the case at the bar.

Under the Federal Rules of Civil Procedure, discovery is limited to "matter[s], not privileged, that [are] relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* In this case, HMC argues that adverse employment action was taken against Adkins in light of his performance during his tenure. By arguing that his record fell below standards the hospital used to judge its physicians, HMC itself put the record and peer review of other physicians at issue. Comparison to disciplinary measures against them is therefore clearly relevant to the case.

HMC argues that any comparison should be limited to physicians in the Department of Surgery since they are the only ones that are "similarly situated" to Adkins. *See Wilson v. B/E Aerospace Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004). We do not agree. While the Department of Surgery is an autonomous unit within the Hospital, some of the infractions at issue arose from hospital-wide rules, such

14

as the requirement to complete medical charts in a timely manner. Additionally, Adkins is entitled to compare the general standard that hospital physicians were held to in order to establish that his punishment was excessive. The limited number of physicians in the Department of Surgery does not allow Adkins to place his case in the context of larger disciplinary processes of the hospital and thus place an excessive burden on his ability to pursue his claim.

We note that although district courts have broad discretion in fashioning discovery rulings, they are bound to adhere "to the liberal spirit of the [Federal] Rules." *Burns v. Thiokol Chem. Corp.,* 483 F.2d 300, 305 (5th Cir.1973). The Federal Rules do not give district courts "blanket authorization . . . to prohibit disclosure of information whenever it deems it advisable to do so, but is rather a grant of power to impose conditions on discovery in order to prevent injury, harassment, or abuse of the court's processes." *Williams v. City of Dothan, Ala*. 745 F.2d 1406, 1416 (11th Cir. 1984) (quoting *Bridge C.A.T. Scan Assocs. v. Technicare Corp.,* 710 F.2d 940, 944-45 (2d Cir. 1903)). The Defendants have failed to demonstrate a burden or an abuse of process sufficient to justify such limitations on discovery, especially in light of the highly relevant nature of the materials sought by Adkins. Although we acknowledge that the district court's limits were aimed in part at protecting the confidentiality of Defendants'

15

documents, these limits excessively narrowed the scope of discovery. We therefore conclude that Adkins was entitled to greater latitude in order to access documents relevant to his discrimination claim, and the district court erred by denying Adkins the opportunity to compel production of a wider range of documents.

*Summary Judgment*

Adkins further challenges the district court's grant of summary judgment in favor of Defendants. In light of the improper limitations on Adkins' ability to conduct discovery, we conclude that Adkins was denied the opportunity to proffer evidence in response to the summary judgment motion. *Burns,* 483 F.2d at 308 n.11. We therefore vacate the grant of summary judgment in order to allow the parties to engage in discovery in accordance with this opinion. Accordingly, the decision of the district court is vacated and remanded.

**VACATED AND REMANDED.**

16