J-A27022-25          2026 PA Super 53

| | | |
|---|---|---|
| TIFFANY GRIFFIN AND CHAD GREAVES | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THE BRYN MAWR HOSPITAL AND MAIN LINE HOSPITALS, INC. D/B/A THE BRYN MAWR HOSPITAL, JOHN DOE, BRENDA DEFEO, AND DONAHUE FUNERAL HOME OF UPPER DARBY, INC. | : | No. 3361 EDA 2024 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: THE BRYN MAWR HOSPITAL AND MAIN LINE HOSPITALS, INC. D/B/A THE BRYN MAWR HOSPITAL, BRENDA DEFEO | : | |
| | : | |
| | : | |
| | : | |

Appeal from the Order Entered December 2, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2022-06086

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

OPINION BY BECK, J.:                                    **FILED MARCH 19, 2026**

The Bryn Mawr Hospital and Main Line Hospitals, Inc. d/b/a The Bryn Mawr Hospital ("the Hospital"), and Brenda DeFeo ("DeFeo") (collectively, "Defendants") appeal from the order entered by the Montgomery County Court of Common Pleas ("trial court") compelling Defendants to produce certain documents to Tiffany Griffin ("Griffin") and Chad Greaves ("Greaves") (collectively, "Plaintiffs").  On appeal, Defendants argue that the trial court erred in concluding that the documents were not privileged under the Medical

Care Availability and Reduction of Error Act ("MCARE")[1] and the Patient Safety Quality and Improvement Act ("PSQIA")[2]. We conclude that the trial court correctly determined that the documents at issue are not subject to the evidentiary privilege under MCARE, but erred in finding that certain of the documents were not subject to the evidentiary privilege of PSQIA. We therefore affirm in part and reverse in part the trial court's order.

**Facts and Procedural History**

In 2018, Griffin became pregnant. Greaves was the father. When she was eighteen weeks pregnant, Griffin and Greaves learned that the fetus had a genetic condition and would likely be stillborn or die soon after delivery. Shortly after receiving this news, on October 1, 2018, Griffin began to bleed heavily and sought medical attention at the Hospital. The Hospital performed an ultrasound-guided dilation and evacuation procedure, during which Griffin delivered the fetus intact but deceased. Plaintiffs declined to donate the fetal remains to the Hospital for testing and instead authorized Donahue Funeral Home of Upper Darby, Inc. ("Donahue Funeral Home") to retrieve and cremate the remains.

On October 13, 2018, Plaintiffs received ashes from Donahue Funeral Home. On October 18, 2018, DeFeo, who was then Vice President of the

_____

[1] 40 P.S. §§ 1303.101-1303.910.

[2] 42 U.S.C. §§ 299b-21-299b-26.

Hospital, called Griffin and informed her that there had been a "mix up" at the Hospital, that the ashes she and Greaves had received were not that of their unborn fetus, but likely were Griffin's placenta, and that they had located the fetal remains. *See* Complaint, 3/5/2020, ¶ 31. The Hospital then gave the remains to Plaintiffs who sent them to another funeral home for cremation.

On March 5, 2020, Plaintiffs filed suit against Defendants in Delaware County. In their complaint, Plaintiffs raised claims of negligent infliction of emotional distress ("NIED"), intentional infliction of emotional distress ("IIED"), tortious interference with a dead body, interference with the right of sepulcher, corporate negligence, and negligence against Defendants.[3] In support of their claims of NIED and IIED, Plaintiffs alleged that they suffered emotional distress with physical manifestations, including "grief, rage, nausea, hysteria, weight loss, nervousness, sleeplessness, nightmares and anxiety[.]" *Id.* ¶¶ 42, 45. Plaintiffs further alleged that Griffin's mental state worsened to the point that she had to be admitted to the Crisis Center at Mercy Fitzgerald Hospital for twelve hours and that her employer subsequently terminated her employment because of her deteriorating mental state. *Id.* ¶¶ 44, 46-48.

In March 2020, Plaintiffs served Defendants with several discovery requests. Of relevance to this appeal, in their request for production of

_____

[3] They further raised claims of NIED and breach of contract against Donahue Funeral Home.

documents, Plaintiffs sought all documents, files, correspondence, and reports related to Griffin, the fetal remains, and the investigation into the mishandling of the fetal remains; any policies or procedures regarding such investigations; and policies and procedures related to the handling of remains. According to Plaintiffs, Defendants objected to most of Plaintiffs' discovery requests, including objections asserting that certain documents were protected from discovery by attorney-client and other statutory privileges.

On September 5, 2023,[4] Plaintiffs filed a motion seeking, in pertinent part, to compel responses to their discovery requests. On February 9, 2024, the trial court issued an order granting in part and denying in part Plaintiffs' motion to compel discovery. Of relevance to this appeal, the trial court permitted Defendants to object to the production of documents with the provision of a privilege log to Plaintiffs, cautioning that Defendants would not be permitted to make a general claim of privilege. *See* Trial Court Order, 2/9/2024, ¶¶ 2-3.

Defendants subsequently provided Plaintiffs with a privilege log identifying the following documents, which are the basis of this appeal ("the four documents"):

_____

[4] The record reflects that there were several delays, beginning on February 24, 2021, when the Delaware County Court of Common Pleas entered an order granting Defendants' request to transfer the case to Montogomery County. Plaintiffs filed a motion for reconsideration on the issue of change of venue, which the Delaware court initially granted, but ultimately transferred the case to Montgomery County, on February 8, 2022.

- 4 -

1. Main Line Health Post Mortem Cause Analysis Report, prepared by Patient Safety Officer, Beth Herbst on October 23, 2018;

2. Situation, Background, Assessment, and Recommendations ("SBAR") Report, prepared by Patient Safety Officer, Beth Herbst on January 10, 2019;

3. Main Line SBAR Report prepared by Judy Gilbert of the Bryn Mawr Pathology Laboratory on October 10, 2019; and

4. Pennsylvania Patient Safety Reporting System Report ("PA-PSRS"), prepared on December 19, 2018.

*See* Memorandum in Support of Defendants' Response to Plaintiffs' Motion for Sanctions, 6/10/2024, Ex. A ("Privilege/Non-Disclosure Log, 3/8/2024"). Defendants claimed that each of the four documents was subject to the evidentiary privileges of MCARE, PSQIA, and the Peer Review Protection Act[5]. *See id.* Defendants later provided an amended privilege log in which they withdrew their Peer Review Protection Act claim of privilege for the four documents and the PSQIA privilege for the PA-PSRS report only. *See id.*, Ex. B ("Amended Privilege/Non-Disclosure Log, 6/10/2024").

Plaintiffs subsequently filed motions seeking to compel the production of the four documents and for sanctions. On August 27, 2024, the trial court held a hearing on these motions and conducted an in-camera review of the four documents. On December 2, 2024, the trial court entered an order

---

[5] 63 P.S. §§ 425.1-425.4.

directing Defendants to produce the four documents to Plaintiffs. This timely appeal followed.[6] Defendants present the following issues for review:

> A. Did the [trial] court err in concluding that the four documents did not pertain to a patient safety event and were therefore not entitled to privilege protection under MCARE or [PSQIA]?
>
> B. Did the [trial] court err in concluding that the four documents did not meet the requirements for privilege protection under [s]ection 311(a) of MCARE?
>
> C. Did the [trial] court err in concluding that the PA-PSRS report to the Pennsylvania Patient Safety Authority was not privileged under [s]ection 311(d) of MCARE?
>
> D. Did the lower court err in ordering the production of patient safety work product that is strictly and preemptively privileged under [PSQIA]?

Defendants' Brief at 5. Although Defendants purport to raise four separate issues on appeal, their brief focuses on two arguments: (1) the trial court erred in determining that the four documents were not subject to MCARE's evidentiary privilege, and (2) the trial court erred in concluding that each of those documents, with the exception of the PA-PSRS report, were not subject to PSQIA's evidentiary privilege. We will examine each statutory privilege and Defendants' corresponding arguments below.

**Standard of Review**

_____

[6] We note that although the appeal from a discovery order is interlocutory, "Pennsylvania courts have held that discovery orders involving potentially confidential and privileged materials are immediately appealable as collateral to the principal action." **Boyle v. Main Line Health, Inc.**, 345 A.3d 291, 294 n.1 (Pa. Super. 2025) (citation omitted).

We begin by setting forth our standard of review of discovery orders and claims of evidentiary privilege.

> In reviewing the propriety of a discovery order, our standard of review is whether the trial court committed an abuse of discretion. Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will.

*Carlino E. Brandywine, L.P. v. Brandywine Vill. Assocs.*, 260 A.3d 179, 195-96 (Pa. Super. 2021) (citation and brackets omitted). "When the claim of privilege requires consideration of a question of law, such as the interpretation of a statute, our standard of review is de novo, and the scope of our review is plenary." *Ford-Bey v. Pro. Anesthesia Servs.*, 302 A.3d 789, 796 (Pa. Super. 2023).

"The purpose of the discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits." *Carlino E. Brandywine*, 260 A.3d at 195 (quotation marks and citation omitted). "Generally, discovery is liberally allowed with respect to any matter, not privileged, which is relevant to the cause being tried." *Id.* (quotation marks and citation omitted).

"Pennsylvania law imposes a shifting burden of proof in disputes when deciding whether to compel disclosure of materials over a claim of any privilege." *Ford-Bey*, 302 A.3d at 796. "The party asserting a privilege bears the burden of producing facts establishing proper invocation of the privilege." *Ungurian v. Beyzman*, 232 A.3d 786, 795 (Pa. Super. 2020). "Then the burden shifts to the party seeking disclosure to set forth facts showing that

disclosure will not violate the privilege." *Id.* (brackets and citation omitted). "If the party asserting the privilege produces insufficient facts to invoke the privilege, then the burden will not shift to the party seeking disclosure." *Ford-Bey*, 302 A.3d at 796. "Absent a sufficient showing of facts to support a privilege[,] the communications are not protected." *Ungurian*, 232 A.3d at 795 (original brackets, quotation marks, and citation omitted).

Our review of the claims raised require us to interpret the relevant statutory provisions. The paramount tenant of the Statutory Construction Act[7] is that "the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." *Foxfield at Naaman's Creek Homeowner's Assoc. v. Eventoff*, 329 A.3d 1271, 1278 (Pa. Super. 2024) (citation and brackets omitted); *see also* 1 Pa.C.S. § 1921(a).

> As we have often recognized, the General Assembly's intent is best expressed through the plain language of the statute. Therefore, when the terms of a statute are clear and unambiguous, they will be given effect consistent with their plain and common meaning. This means ascribing to the particular words and phrases the definitions which they have acquired through their common and approved usage. It is only in instances where the words of a statute are not explicit, or they are ambiguous, is there need to resort to consideration of the factors in aid of construction enumerated in 1 Pa.C.S.[] § 1921(c).

*Eventoff*, 329 A.3d at 1278 (quotation marks, brackets, and citations omitted); *see also* 1 Pa.C.S. §§ 1903(a), 1921(b). "Moreover, when a term

_____

[7] 1 Pa.C.S. §§ 1501-1991.

- 8 -

is not defined in a statute, its common and approved usage may be ascertained by examining its dictionary definition." ***Eventoff***, 329 A.3d at 1278 (quotation marks and citation omitted).

**MCARE**

The General Assembly's stated objective of MCARE is "to ensure that medical care is available in this Commonwealth through a comprehensive and high-quality health care system." 40 P.S. § 1303.102. Chapter 3 of MCARE "relates to the reduction of medical errors for the purpose of ensuring patient safety." ***Id.*** § 1303.301. It requires medical facilities to "develop, implement[,] and comply with an internal patient safety plan that shall be established for the purpose of improving the health and safety of patients[,]" which, pertinent to this appeal, must establish a system for healthcare workers to report "incidents" and "serious events." ***Id.*** § 1303.307(a), (b)(3). An "incident" is "[a]n event, occurrence[,] or situation involving **the clinical care of a patient** in a medical facility which could have injured **the patient** but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient." ***Id.*** § 1303.302 (emphasis added). A "serious event" is "[a]n event, occurrence or situation involving **the clinical care of a patient** in a medical facility that **results in death or compromises patient safety** and results in an unanticipated injury requiring the delivery of additional health care services to the patient." ***Id.*** (emphasis added). As the bolded language reflects, a key component of both an

"incident" and a "serious event" is that each must be related to the clinical care of a specific patient. *See id.*

Healthcare workers that reasonably believe an incident or serious event has occurred must report them according to the dictates of the patient safety plan. *Id.* § 1303.308(a). The patient safety plan must designate a patient safety officer and establish a patient safety committee for the taking, investigation, and review of such reports. *Id.* §§ 1303.307(b), 1303.310(b). Medical facilities must then report serious events to the Pennsylvania Department of Health ("the Department") and the Pennsylvania Patient Safety Authority ("the Authority"), and incidents solely to the Authority. *Id.* 1303.313(a), (b).

The General Assembly included corresponding confidentiality provisions to the reporting requirements delineated in Chapter 3.[8]

---

[8] Section 1303.311 provides, in relevant part:

**(a) Prepared materials.--**Any documents, materials or information solely prepared or created for the purpose of compliance with section 310(b) or of reporting under section 304(a)(5) or (b), 306(a)(2) or (3), 307(b)(3), 308(a), 309(4), 310(b)(5) or 313 which arise out of matters reviewed by the patient safety committee pursuant to section 310(b) or the governing board of a medical facility pursuant to section 310(b) are confidential and shall not be discoverable or admissible as evidence in any civil or administrative action or proceeding. Any documents, materials, records or information that would otherwise be available from original sources shall not be construed as immune from discovery or use in any civil or administrative

*(Footnote Continued Next Page)*

Critical for our purposes is that section 311(a) protects "[a]ny documents, materials or information solely prepared or created for the purpose of compliance with section 310(b) or of reporting under" the listed statutory provisions, "which arise out of matters reviewed by the patient safety committee pursuant to section 310(b) or the governing board of a medical

_____

action or proceeding merely because they were presented to the patient safety committee or governing board of a medical facility.

\* \* \*

**(c) Applicability.--**The confidentiality protections set forth in subsections (a) and (b) shall only apply to the documents, materials or information prepared or created pursuant to the responsibilities of the patient safety committee or governing board of a medical facility set forth in section 310(b).

**(d) Received materials.--**Except as set forth in subsection (f), any documents, materials or information received by the authority or department from the medical facility, health care worker, patient safety committee or governing board of a medical facility solely prepared or created for the purpose of compliance with section 310(b) or of reporting under section 304(a)(5) or (b), 306(a)(2) or (3), 307(b)(3), 308(a), 309(4), 310(b)(5) or 313 shall not be discoverable or admissible as evidence in any civil or administrative action or proceeding. Any records received by the authority or department from the medical facility, health care worker, patient safety committee or governing board of a medical facility pursuant to the requirements of this act shall not be discoverable from the department or the authority in any civil or administrative action or proceeding. Documents, materials, records or information may be used by the authority or department to comply with the reporting requirements under subsection (f) and section 304(a)(7) or (c) or 306(b).

*Id.* § 1303.311(a), (c), (d).

facility pursuant to section 310(b)." ***Id.*** § 1303.311(a). Section 311(d) provides the same evidentiary privilege for "documents, materials or information" involving the same statutory provisions that a medical facility sends to the Department or the Authority. ***Id.*** § 1303.311(d). The commonality between the listed statutory provisions in sections 311(a) and (d) is that each provision sets forth guidelines and mandates for investigations and reporting relating to incidents and serious events. ***See id.*** §§ 1303.304(a)(5), (b), 1303.306(a)(2)-(3), 1303.307(b)(3), 1303.308(a), 1303.309(4), 1303.310(b)(5), 1303.313.

Thus, materials created or received to comply with Chapter 3's reporting requirements are privileged and not subject to disclosure in litigation. ***See Ford-Bey***, 302 A.3d at 795; ***see also*** 40 P.S. § 1303.311(a), (c), (d). As this Court has explained, the General Assembly intended for the confidentiality provision of section 311 to balance the MCARE requirements to report and respond to incidents and serious events "with assurances that documents, material, and information prepared or created to comply with MCARE will not be used against a facility in civil litigation." ***Ford-Bey***, 302 A.3d at 795. Additionally, the plain language of the statute makes clear that the General Assembly's intent in enacting MCARE was to promote patient safety. ***See*** 40 P.S. § 1303.301 (stating that MCARE "relates to the reduction of medical errors for the purpose of ensuring patient safety").

<u>Arguments and Trial Court Rationale</u>

Defendants contend that the trial court erred in concluding that the four documents were not subject to the MCARE privilege. *See* Defendants' Brief at 23-39. They assert that the trial court wrongly determined that documents and information relating to the Hospital's mishandling of the fetal remains were not within the scope of MCARE's section 311 privilege provisions because the mishandling of the fetal remains did not occur during the direct administration of clinical care to a patient. *Id.* at 23-24. According to Defendants, the "disposition of fetal remains extracted during delivery of a stillborn fetus is closely related and connected to the medical procedure itself; indeed, it is a necessary consequence of the medical procedure." *Id.* at 26. They argue that by restricting the reporting and privilege provisions of MCARE to exclude any occurrence that does not involve the direct clinical care of a patient, the trial court's interpretation of the terms "serious event" and "incident" was too narrow. *See id.* at 24-26. "In doing so, the court brushed aside the allegations of the [c]omplaint, which alleged not just potential, but actual, harm to [Griffin] as a direct and foreseeable consequence of the error in disposition of the fetal remains that had been extracted from her." *Id.* at 26.

Additionally, Defendants argue that they satisfied all the "basic requirements" for reporting under MCARE, as the Hospital has a patient safety plan, a patient safety office, and a patient safety committee, and their affidavit evidence demonstrates that the Hospital prepared each of the four documents

solely for MCARE compliance. ***See id.*** at 30-35. Consequently, they assert that under these circumstances, the four documents were privileged under section 311(a) of MCARE. ***Id.*** at 32-35. Further, Defendants contend that the PA-PSRS report is also subject to the privilege of section 311(d) of MCARE, as the Hospital submitted that report to the Authority. ***Id.*** at 39.

In rejecting Defendants' claim that the four documents are subject to the evidentiary privilege of MCARE, the trial court explained:

> The allegations of the [c]omplaint in this case do not allege liability involving the clinical care of a patient [that] resulted in or could have resulted in the death or serious injury to a patient. The provisions of the MCARE Act are not applicable to the issues in this lawsuit. There are no allegations of medical errors by any of the [d]efendants. The alleged negligence does not meet the definition of a "serious event" or "incident" as set forth in this act, as they do not involve "the clinical care of a patient in a medical facility." There are no allegations that the "clinical care provided to the patient," [Griffin], was negligent or at issue in this lawsuit. Therefore, no privilege provided by the MCARE Act prevents discovery of the documents Plaintiffs seek.

Trial Court Opinion, 3/12/2025, at 12-13 (footnote omitted).

### Analysis

The record reflects that Patricia Walsh ("Walsh"), the System Manager for Risk and Safety at Main Line Health, averred in her affidavit that the Hospital had a patient safety officer, a patient safety plan, and patient safety committee. Memorandum in Support of Defendants' Response to Plaintiffs' Motion for Sanctions, 6/10/2024, Ex. C ("Walsh Affidavit, 6/7/2024") ¶¶ 4-6. Thus, the Hospital had the necessary personnel and systems in place for investigating and reporting incidents and serious events under MCARE. ***See***

*id.*; *see also* 40 P.S. § 1303.307(b)(1)-(3).  The record further reflects that Beth Herbst, the Hospital's patient safety officer, stated in her affidavit that after receiving Judy Gilbert's SBAR report from the pathology lab regarding the fetal remains and her own investigation of the issue, she determined that the mishandling of the fetal remains was reportable as an incident under MCARE.  Memorandum in Support of Defendants' Response to Plaintiffs' Motion for Sanctions, 6/10/2024, Ex. D ("Herbst Affidavit, 6/7/2024") ¶¶ 5, 9.

While Defendants may have believed that the mishandling of the fetal remains was a reportable incident under MCARE and that they investigated and reported it as such, nothing in the language of MCARE's confidentiality provisions supports a finding that a medical facility's subjective belief as to whether an issue is reportable as an incident or serious event controls the applicability of the evidentiary privilege.  *See* 40 P.S. § 1303.311.  To the contrary, section 311(a) expressly states that "[a]ny documents, materials, records or information that would otherwise be available from original sources shall not be construed as immune from discovery or use in any civil or administrative action or proceeding **merely because they were presented to the patient safety committee** or governing board of a medical facility." *Id.* § 1303.311(a) (emphasis added).

We therefore conclude that documents, materials, records, or information must relate to an issue that satisfies the statutory definition of an "incident" or "serious event" to be subject to MCARE's evidentiary privilege.

*See id.* § 1303.311. To conclude otherwise, i.e., to allow a medical facility's subjective belief to control, would, in effect, permit a medical facility to use the MCARE privilege as a sword instead of a shield, and make privileged any document it wished not to disclose in litigation. With that in mind, we now examine whether the mishandling of the fetal remains constituted an incident or serious event under MCARE.

As stated above, for an event, situation, or occurrence to constitute an incident or serious event, it must involve "the clinical care of a patient[.]" 40 P.S. § 1303.302. Although the statute does not define the phrase "clinical care," its common and approved usage reflects that it constitutes the provision of direct medical attention to a patient. *See* TABER'S CYCLOPEDIC MEDICAL DICTIONARY, 501, 390 (24th ed. 2021) (defining "clinical" as "[f]ounded on actual observation and treatment of patients as distinguished from data or facts obtained from other sources" and "care" as "the application of professional skill, support, and concern to provide health benefits to a person or a community"). This aligns with the definitions of substantially similar phrases in other statutory provisions. *See, e.g.,* 43 P.S. § 932.2 (defining "clinical care services" in the Prohibition of Excessive Overtime in Health Care Act as the "diagnostic, treatment or rehabilitative services provided in a health care facility"); 34 Pa. Code § 123.103(b) (under the Workers' Compensation Act, the "the phrase 'active in clinical practice' means the act of providing

preventive care and the evaluation, treatment and management of medical conditions of patients on an ongoing basis").

In this case, the claims Plaintiffs raised in their complaint relate to the Hospital's actions that occurred after the administration of direct medical care to Griffin. *See* Complaint, 3/5/2020, ¶¶ 49-112. More directly, the Hospital's handling of the fetal remains did not have any impact on the dilation and evacuation procedure the Hospital performed on Griffin, the patient. *See id.* Following the completion of the dilation and evacuation, there was nothing more that Griffin needed for her medical care—no testing of the fetal remains was required (in fact, she expressly refused to allow any such testing to occur)—and neither party contends that Defendants' mishandling of the fetal tissue could have in any way impacted the medical care Griffin required. *See id.* The Hospital's mishandling of the fetal remains was wholly attenuated from Griffin's care and therefore did not constitute "clinical care of a patient." Nor could the mishandling of fetal remains "have injured the patient," as is required for an "incident" or have resulted in her "death or compromise[d] patient safety" as is required for it to constitute a "serious event." *See* 40 P.S. § 1303.302.

Although Plaintiffs allege that Griffin ultimately suffered emotional distress from the mishandling of the fetal remains, which required additional treatment in the form of mental health intervention, this was entirely unrelated to the clinical care Griffin received from Defendants—i.e., the

dilation and evacuation procedure she received at the Hospital. ***See*** Complaint, 3/5/2020, ¶¶ 42-48. Accordingly, based on the foregoing we conclude that the trial court did not err in determining that the section 311 privilege does not apply to the four documents.

## PSQIA

"PSQIA was enacted to establish a nationally uniform set of protections for healthcare providers, and to encourage hospitals and other healthcare providers to analyze and discuss patient safety and healthcare quality, including medical errors, without fear of those evaluations being used in civil litigation." ***Boyle***, 345 A.3d at 303. The privilege provision of PSQIA protects "patient safety work product." 42 U.S.C. § 299b-22(a). It defines "patient safety work product" as

> any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements--
>
> (i) which--
>
>> (I) are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or
>>
>> (II) are developed by a patient safety organization for the conduct of patient safety activities; and which could result in improved patient safety, health care quality, or health care outcomes; or
>
> (ii) which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system.

*Id.* § 299b-21(7)(A). Section 299b-22 thus provides that patient safety work product is privileged and confidential and not subject to a discovery order in a state civil proceeding. *See id.* § 299b-22(a)-(b). These privileges also apply notwithstanding any other provision of state law. *See id.*

The term "patient safety activities" under PSQIA means the following:

**(A)** Efforts to improve patient safety and the quality of health care delivery.

**(B)** The collection and analysis of patient safety work product.

**(C)** The development and dissemination of information with respect to improving patient safety, such as recommendations, protocols, or information regarding best practices.

**(D)** The utilization of patient safety work product for the purposes of encouraging a culture of safety and of providing feedback and assistance to effectively minimize patient risk.

**(E)** The maintenance of procedures to preserve confidentiality with respect to patient safety work product.

**(F)** The provision of appropriate security measures with respect to patient safety work product.

**(G)** The utilization of qualified staff.

**(H)** Activities related to the operation of a patient safety evaluation system and to the provision of feedback to participants in a patient safety evaluation system.

*Id.* § 299b-21(5).

<u>Arguments and Trial Court Rationale</u>

Defendants assert that the trial court erred in concluding the documents at issue (those other than the PA-PSRS report) ("the three documents") were not subject to the PSQIA evidentiary privilege. *See* Defendants' Brief at 40-

52. Specifically, they contend that the trial court incorrectly determined that documents or other information relating to the investigation, analysis, and reporting of the mishandling of the fetal remains did constitute patient safety work product under PSQIA. *See id.* Defendants contend that for documents to be privileged under PSQIA, they do not need to relate to a patient, as PSQIA does not require a nexus between the information a party is seeking and a patient or medical care provided by a medical facility. *Id.* at 45-47. Rather, they maintain that language of PSQIA is far broader than MCARE, and that information or documentation constitutes patient safety work product so long as "its review is geared towards improving quality." *Id.* at 47-48. Pointedly, Defendants argue that, "the tracking of tissue in the laboratory and the whereabouts of fetal remains fall squarely within that purpose" and that "it is unquestionable that policies and procedures regarding the storage and tracking of specimens in the lab is of critical consequence to the health, safety and quality of care provided by [a medical facility]." *Id.* at 48, 50. Additionally, Defendants observe that PSQIA is a federal statute that supersedes "any conflicting state law provision that otherwise render the information discoverable." *Id.* at 42.

In rejecting Defendants' claim that the three documents are subject to the evidentiary privilege of PSQIA, the trial court explained:

> The documents sought by [Plaintiffs] do not fit the definition of patient work safety product as defined in 42 U.S.C. [§] 229b-21. The records sought do not involve care given to a patient by a medical provider. This lawsuit is not about patient safety issues.

Rather, it is about alleged negligence in [the handling of the fetal remains]. Thus, because the alleged negligence in this case did not involve patient safety as defined in PSQIA, the Patient Safety and Quality Improvement Act does not provide any privilege to [Defendants that would preclude] the disclosure of the documents Plaintiffs seek.

Trial Court Opinion, 3/12/2025, at 13-14.

Analysis

At the outset, we agree with the trial court that the three documents in question are not privileged under section 299b-21(7)(A)(i). ***See id.*** The record reflects that Walsh conceded in her affidavit that the Hospital did not report the three documents at issue to the Hospital's patient safety organization nor did the patient safety organization prepare the documents. ***See*** Walsh Affidavit, 6/7/2024, ¶ 12. Additionally, Defendants make no assertion that the patient safety organization developed the three documents. ***See*** Defendants' Brief at 40-52.

We disagree, however, with the trial court's conclusion as it relates to section 299b-21(7)(A)(ii). ***See*** Trial Court Opinion, 3/12/2025, at 13-14. In contrast to MCARE, a medical facility's intent in developing a document is relevant in determining whether the document is subject to PSQIA's privilege provision as section 299b-21(7)(A)(ii) expressly states the privilege applies to "deliberations or analysis of, or … reporting pursuant to, a patient safety evaluation system." ***Compare*** 40 P.S. §§ 1303.302, 1303.307(b), 1303.310(b), 1303.311(a), ***with*** 42 U.S.C. § 299b-21(7)(A)(ii). In this case, Walsh stated in her affidavit that the three documents constitute "analysis"

- 21 -

conducted within the Hospital's patient safety evaluation system. Walsh Affidavit, 6/7/2024, ¶¶ 12-14. She also frequently refers to the documents as patient safety work product. *See id.* Additionally, the Hospital's patient safety evaluation system policy states that patient safety work product is privileged and confidential and its definition of patient safety work product mirrors PSQIA's same definition and includes the clarification that information for which privilege is asserted must be of a category that "could improve patient safety, health care quality or health care outcomes." *Id.*, Ex. B at 2. Further, we reviewed the three documents for purposes of this appeal and confirmed that they include analysis pursuant to the Hospital's patient safety evaluation system, detailing the facts underlying what occurred and how, if at all, it aligned with or violated the Hospital's policies and processes.

Importantly, unlike MCARE, PSQIA includes no requirement that patient safety work product bear a direct link or nexus to a particular patient or the clinical care of a patient. *See, e.g., Shands Teaching Hosp. & Clinics, Inc. v. Beylotte*, 357 So.3d 307, 309 (Fla. Dist. Ct. App. 2023) (holding that report regarding a visitor's slip-and-fall at a hospital was privileged even though the visitor was not a patient because "staff, patients, and visitors alike" could "face similar slip-and-fall risks in a hospital's common areas"). Instead, as the plain language of the statute makes clear, for the PSQIA privilege under section 299b-21(7)(A)(ii) to apply, the document in question must simply contain "deliberations or analysis of, or … reporting pursuant to, a patient

safety evaluation system." 42 U.S.C. § 299b-21(7)(A)(ii). PSQIA protects "work product so long as it identifies or constitutes the deliberations or analysis of, or identifies the fact of reporting pursuant to a patient safety evaluation system, … regardless of whether it is reported to a patient safety organization." *In Re: Baycare Med. Grp.*, 101 F.4th 1287, 1291 (11th Cir. 2024) (citation and quotation marks omitted).

Moreover, unlike MCARE, PSQIA not only addresses what happened to a given patient, but hypothetically what could have happened to a similarly situated patient in another circumstance. *Compare* 40 P.S. §§ 1303.302, 1303.307(b), 1303.310(b), 1303.311(a), *with* 42 U.S.C. § 299b-21(7)(A)(ii). Thus, contrary to the trial court's conclusion, for purposes of the PSQIA privilege it is of no moment that the allegations in the complaint did relate to medical care the Hospital administered to Griffin or a patient safety issue, and instead exclusively related to the mishandling of the fetal remains. *See* Trial Court Opinion, 3/12/2025, at 13-14.

The Senate Report on PSQIA confirms our interpretation that the unambiguous language of the statute reflects the legislature's intent for a broad definition of patient safety work product, as it states that "the entire health care delivery system can benefit from a systems analysis of near misses and errors that have resulted in adverse events for systems improvement and corrective action." Senate Report, 108-196 (Nov. 17, 2003) at 4. This more

expansive application of the privilege also aligns with the overall purpose of PSQIA:

> The purpose of this legislation is to encourage a "culture of safety" and quality in the U.S. health care system by providing for broad confidentiality and legal protections of information collected and reported voluntarily for the purposes of improving the quality of medical care and patient safety. These protections will facilitate an environment in which health care professionals and organizations report and evaluate health care errors and share their experiences with others in order to prevent similar occurrences.

*Id.* at 3; *see also Francis v. U.S.*, 2011 WL 2224509, at *6 (S.D. N.Y. 2011) (unpublished decision) (describing the protections afforded by the PSQIA confidentiality privilege as "broad").

Based on the foregoing, we conclude that the mishandling of the fetal remains that occurred here falls squarely within the stated purpose of PSQIA. The record reflects that in response to the mishandling of the fetal remains, the Hospital investigated the incident as a failure of its laboratory and pathology procedures. *See* Herbst Affidavit, 6/7/2024, ¶¶ 4-6. Indeed, one of the documents to which Defendants assert the PSQIA privilege attaches was prepared by staff from the pathology lab. *See* Amended Privilege/Non-Disclosure Log, 6/10/2024. Additionally, the Hospital's uncontroverted affidavit evidence established that the documents in question contained analysis and that the Hospital maintained the three documents exclusively within its patient safety evaluation system. *See* Herbst Affidavit, 6/7/2024, ¶¶ 5, 8; Walsh Affidavit, 6/7/2024, ¶¶ 12-14. This established the necessary

requirements for application of PSQIA's privilege under section 299b-21(7)(A)(ii), as the record supports the conclusion that the three documents were deliberations or analysis of, or reporting pursuant to, the Hospital's patient safety evaluation system. *See id.*

As we have already concluded, the failing of the Hospital's laboratory and pathology procedures did not harm or threaten harm to Griffin as it related to her dilation and evacuation procedure. However, if the laboratory and pathology procedural failing occurred in a different context—for example, the mishandling of potentially cancerous tissue removed from a patient that required further testing—this could have resulted in a delayed or incorrect diagnosis, and therefore would clearly involve issues of patient safety. *Cf. Green Analytics North, LLC v. Pa. Dep't of Health*, 343 A.3d 1086, 1097 (Pa. 2025) (explaining, in a case involving the Medical Marijuana Act, "accurate and independent test results serve the clearly expressed statutory goals of patient safety"). It is indisputable that policies and procedures regarding the storage and tracking of laboratory or pathology specimens that require further testing for patient diagnosis and/or treatment are critical to the health, safety, and quality of care provided by a hospital.[9] *See id.*

_____

[9] Respectfully, the concurring and dissenting opinion ("CDO") interprets PSQIA too narrowly. *See* CDO at 10. Our learned colleague focuses on what specifically may or may not have occurred with respect to the fetal remains in this case, based upon Hospital policy, rather than more broadly considering the implications of the Hospital's mishandling of excised tissue. The record

*(Footnote Continued Next Page)*

**Conclusion**

Based on the foregoing, we conclude that the trial court correctly found that the four documents were not privileged under MCARE. It erred, however, in determining that the three documents did not constitute patient safety work product under PSQIA and were not subject to PSQIA's privilege protection. We therefore affirm the trial court's order to the extent that it requires Defendants to disclose the PA-PSRS report and reverse the order to the extent that it requires Defendants to disclose the remaining three documents.

Order affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judge Bowes joins the Opinion.

Judge Murray files a Concurring and Dissenting Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/19/2026

---

indicates that the Hospital left the fetal remains in the morgue for an extended period, and that the morgue expressly falls within the purview of the pathology department. Thus, this matter directly involves the Hospital's pathology department mishandling or misplacing human tissue. As we explained above, PSQIA not only addresses what happened to a specific patient in a given situation, but hypothetically what could have happened to a similarly situated patient in another circumstance.

- 26 -